Thomas G. Hungar, SBN 144956
  thungar@gibsondunn.com
Kellam M. Conover (*pro hac vice to be filed*)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, DC  20036-5306
Phone: (202) 887-3784
Fax: (202) 530-4213

Attorneys for Plaintiff
ARCBEST II, INC. d/b/a U-PACK

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARCBEST II, INC. d/b/a U-PACK,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>NICHOLAS OLIVER, in his official capacity as Chief of the California Bureau of Household Goods and Services; KIMBERLY KIRCHMEYER, in her official capacity as Director of the California Department of Consumer Affairs; LOURDES M. CASTRO RAMIREZ, in her official capacity as Secretary of the California Business, Consumer Services and Housing Agency; MATTHEW RODRIQUEZ, in his official capacity as Acting Attorney General of California; GAVIN NEWSOM, in his official capacity as Governor of the State of California,<br><br>　　　　Defendants. | CASE NO. _____<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Plaintiff ARCBEST II, INC. D/B/A U-PACK ("U-Pack"), states its complaint for declaratory and injunctive relief against Defendants as follows:

## INTRODUCTION

1. U-Pack brings this lawsuit to vindicate its rights guaranteed by the Supremacy Clause of the United States Constitution, the Federal Aviation Administration Authorization Act ("FAAAA"), and California law. U-Pack seeks declaratory and injunctive relief prohibiting Defendants from unlawfully applying and enforcing against U-Pack the requirements of the California Household Movers Act ("the California Act"), California Business & Professions Code § 19225 *et seq.*, including any requirement to obtain or operate under a state licensing permit under California Business & Professions Code §§ 19235 and 19237.

2. Since 1997, U-Pack has assisted customers with moves between California and other States by arranging for safe transportation of their self-packed and self-loaded property at rates substantially lower than traditional full-service moving companies and other competitors. U-Pack's interstate transportation services have never previously been subject to regulation by the State of California through its Bureau of Household Goods and Services ("BHGS"). During that time, U-Pack's safe and low-cost services have outpaced the competition and earned U-Pack an "A+" reputation among consumers.

3. Now, however, BHGS is threatening to impose substantial civil and criminal penalties against U-Pack unless U-Pack either ceases providing California customers with its low-cost and customer-friendly transportation services or obtains a household-movers permit from BHGS and complies with BHGS's costly, burdensome, and inapplicable regulatory regime.

4. Defendants' attempts to subject U-Pack to BHGS's extensive regulatory regime are not lawful. Decades ago, Congress made clear that federal law exclusively governs the interstate transportation of property, including household goods. To prevent a "state regulatory patchwork" in this area, Congress enacted the FAAAA in 1994 and expressly preempted state regulation of interstate moving services like U-Pack's. *Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 372–73 (2008).

5.      Even California law does not permit Defendants to impose BHGS's permit requirement on U-Pack.  That requirement applies only to entities engaged in the business of transporting household goods "entirely within this state [*i.e.*, California]."  Cal. Bus. & Prof. Code § 19237(a)(1).  U-Pack, however, does not arrange for any moves or shipments entirely within California.

6.      Absent preliminary and permanent injunctive relief, U-Pack faces the imminent threat of being subjected to draconian civil and criminal penalties—or alternatively the loss of a sizeable portion of its business—if it does not obtain a BHGS permit.  And if U-Pack is unlawfully forced to obtain a BHGS permit, it will be subject to a costly and inapplicable statutory and regulatory regime that would require U-Pack to significantly restructure its California-related business in ways that would substantially harm its operations, profits, competitiveness, and customer goodwill.

7.      Defendants' actions threaten to harm consumers too, absent preliminary and permanent injunctive relief.  If U-Pack is forced to cease its California-related services entirely, consumers will face severe disruption of their pending moves, heightened safety risks, fewer market options, and higher prices; and if U-Pack is forced to comply with BHGS's pricing regime, it will need to increase its prices and will lose its ability to provide generally accurate price estimates.

8.      U-Pack seeks a declaration that federal law preempts the California Act's requirements as applied to U-Pack, and a corresponding injunction prohibiting Defendants from attempting to apply or enforce such provisions against U-Pack.

9.      U-Pack also seeks a declaration that California law does not authorize Defendants to impose BHGS's permit requirements on U-Pack, and a corresponding injunction prohibiting Defendants from attempting to apply or enforce such permit requirements against U-Pack.

## JURISDICTION AND VENUE

10.     This action arises under the Constitution and laws of the United States, including the Supremacy Clause, U.S. Const. art. VI, § 2, and the FAAAA, 49 U.S.C. §§ 14501(b), 14501(c).  This Court has jurisdiction under 28 U.S.C. § 1331 and § 1367.

11. This is a proceeding for injunctive relief and a declaratory judgment under the Supremacy Clause of the United States Constitution, the FAAAA, 28 U.S.C. §§ 2201–2202, and California law. This action presents an actual controversy within the Court's jurisdiction.

12. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because Defendants Nicholas Oliver, Kimberly Kirchmeyer, Lourdes M. Castro Ramirez, Matthew Rodriquez, and Gavin Newsom are resident in this district, and a substantial portion of the transportation services provided by Plaintiff and at issue in this case are contracted for and carried out within the geographical boundaries of this district, such that a substantial part of the events giving rise to the claim occur in this district.

**PARTIES**

13. Plaintiff ArcBest II, Inc. is a transportation logistics company that is federally licensed by the Federal Motor Carrier Safety Administration ("FMCSA") as a property broker and freight forwarder (US DOT #2946400) and does business as "U-Pack." U-Pack arranges for the transportation of customers' property between California and other States and offers its California-related transportation services to customers moving from, or moving to, this judicial district.

14. Defendant Nicholas Oliver is the Chief of the Bureau of Household Goods and Services ("BHGS"), an executive agency that is charged with oversight and enforcement of licensing, regulatory, and disciplinary functions pertaining to the California Act. *See* Cal. Bus. & Prof. Code § 9810(a).

15. Defendant Kimberly Kirchmeyer is the Director of the California Department of Consumer Affairs, an executive agency that is charged with the oversight, enforcement, and licensure of professions, and that oversees BHGS. *See* Cal. Bus. & Prof. Code §§ 100, 9810(a).

16. Defendant Lourdes M. Castro Ramirez is the Secretary of the California Business, Consumer Services and Housing Agency, a cabinet-level executive agency that assists and educates consumers regarding the licensing, regulation, and enforcement of professionals and businesses and oversees the Department of Consumer Affairs. *See* Cal. Gov't Code § 12800(a); Cal. Bus. & Prof. Code § 100.

17. Defendant Matthew Rodriquez is the Acting Attorney General of California and is charged with enforcing and defending all state laws. Because this action challenges the constitutional validity of the BHGS permit requirement as applied to U-Pack, the Attorney General is an appropriate party to defend this action. *See* Cal. Gov't Code § 12510 *et seq.*

18. Defendant Gavin Newsom is the Governor of the State of California and is charged with, *inter alia*, oversight of the Secretary of the California Business, Consumer Services and Housing Agency. Cal. Gov't Code § 12010.

## GENERAL ALLEGATIONS

### Federal Law Exclusively Governs Interstate Transportation Services

19. Congress enacted the FAAAA in 1994 to ensure that interstate transportation services would be governed exclusively by federal law.

20. At the time, Congress found the "sheer diversity of [state] regulatory schemes . . . a huge problem for national and regional carriers attempting to conduct a standard way of business." H.R. Rep. No. 103-677, at 87 (1994). Congress's "overarching goal" in enacting the FAAAA was "helping ensure transportation rates, routes, and services that reflect maximum reliance on competitive market forces, thereby stimulating efficiency, innovation, and low prices, as well as variety and quality." *Rowe*, 552 U.S. at 371 (internal quotation marks omitted).

21. To promote deregulation and prevent a "state regulatory patchwork" of laws from governing interstate transportation services, *Rowe*, 552 U.S. at 372–73, Congress included in the FAAAA two broad preemption provisions relevant here.

22. *First*, the FAAAA provides that "a State . . . may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of . . . any motor private carrier, broker, or freight forwarder with respect to the transportation of property." 49 U.S.C. § 14501(c)(1).

23. Although Congress created an exception to this provision for the "*intra*state transportation of household goods," 49 U.S.C. § 14501(c)(2)(B) (emphasis added), that exception does not apply to the *inter*state transportation of household goods, and the exception was limited even further when Congress later specified that it "appl[ies] only to a household goods motor carrier" as

1  defined in the statute, Pub. L. No. 109-59 § 4202(c), 119 Stat. 1144 (2005); *see Ellenburg v. PODS Enters., LLC*, 473 F. Supp. 3d 1095, 1103–04 (E.D. Cal. 2020) (Mueller, C.J.).

24. *Second*, even with respect to *intra*state transportation, the FAAAA provides, "no State . . . shall enact or enforce any law, rule, regulation, standard, or other provision having the force and effect of law relating to [the] intrastate rates, intrastate routes, or intrastate services of any freight forwarder or broker." 49 U.S.C. § 14501(b)(1).

25. The California State Assembly has also recognized that federal law exclusively governs *inter*state transportation services. The California Act requires household movers to obtain a state permit only for *intra*state transportation of household goods.

26. Specifically, the California Act provides, "[a] household mover[/broker] shall not engage . . . in the business of the transportation of used household goods and personal effects by motor vehicle over any public highway in this state" unless, "[f]or transportation of household goods and personal effects *entirely within this state*, there is in force a permit issued by [BHGS]," and "[f]or transportation of household goods and personal effects *from this state to another state or from another state to this state*, there is in force a valid operating authority issued by the Federal Motor Carrier Safety Administration." Cal. Bus. & Prof. Code § 19237(a) (emphases added).

**U-Pack's California-Related Services Are Exclusively Interstate and Greatly Benefit Customers**

27. Established in 1997, U-Pack is a do-it-yourself moving service with a simple business model: U-Pack drops off a trailer or ReloCube ("cube") container at the customer's home; the customer packs and loads the contents of the container without any help from U-Pack; U-Pack arranges for the container to be transported to the customer's new home; and the customer then unloads and unpacks the contents of the container without any help from U-Pack.

28. U-Pack's California-related services do not facilitate any intrastate transportation. Customers using U-Pack's services are either moving from the State of California to a different State, or from a different State to the State of California. When a customer requests a price quote for transportation entirely within the State of California, U-Pack refers the customer to a competitor that does provide intrastate moving services entirely within the State of California. U-Pack does not arrange for any moves or shipments entirely within the State of California.

29. Since its establishment in 1997, the prices, routes, and services of U-Pack's California-related transportation services have never been subject to regulation by the State of California.

30. Free from BHGS's permit requirement and onerous regulatory scheme, U-Pack has earned an "A+" rating from the Better Business Bureau, and is proud to have obtained the highest levels of customer satisfaction. U-Pack stands out among its competitors as a company that arranges for self-packed moving services in a safe, cost-effective, and customer-friendly manner.

31. U-Pack's transportation services typically cost only about half as much as what full-service moving companies charge for packing and moving the same property. That is mainly because, unlike full-service moving companies, U-Pack does not pack, load, or unload the customer's property, and it charges customers based on the volume of the container (or cubes) they select, not the weight of the property transported. In contrast, movers operating under weight-based pricing must divert from their route and undergo delays in order to weigh each truck at a certified scale both before and after loading the customer's goods—and that added cost is passed on to the customer.

32. U-Pack's model also provides customers greater certainty over pricing as compared to full-service companies. Customers know exactly how much each ReloCube or linear foot of space in a freight trailer will cost, and they retain control of how much space is used as they load the container. The quoted estimate always matches the final price when a U-Pack customer loads her property within the quoted number of ReloCubes or quoted space within a freight trailer. In contrast, a pricing model based on weight leaves customers largely uncertain of what the price will be until the goods are shipped and the carrier weighs the goods—which often results in a final price much higher than the quoted estimate.

33. U-Pack stands well apart from full-service companies, which are well known in the industry for their high prices and low customer-satisfaction rates. According to one recent article, the Better Business Bureau receives an average of 13,000 complaints and negative reviews about household movers each year, and more than 1,300 moving companies have an "F" rating from the Bureau due to unresolved or unanswered customer complaints. Unlike U-Pack, many of these movers are not legitimate enterprises or registered with the FMCSA, and they have a reputation for

retaining customers' goods to extract higher prices[1]—whereas with U-Pack, customers pack their property themselves into secure and locked containers, and a federally licensed motor carrier, not U-Pack, then transports the property for the customer.

34. U-Pack also offers significant benefits over traditional moving-equipment rental companies such as U-Haul, which require their customers—who often have little or no commercial driving experience—to rent moving vehicles and do their own driving. It is well documented that requiring unskilled customers with little or no commercial driving experience to drive large moving vehicles poses significant safety risks. In contrast, U-Pack arranges for a federally licensed motor carrier to transport a customer's property, in trucks driven by professional, highly skilled, and often unionized drivers with commercial driver licenses.

35. U-Pack further offers significant benefits over companies like PODS and 1-800-PACK-RAT that similarly arrange for transportation of customers' property in portable storage containers. These competitors' services generally tend to be more expensive than U-Pack's. And since 1997, U-Pack has developed in-depth knowledge of where and when small-freight carriers have available transportation capacity. By offering this available capacity to its customers, U-Pack saves customers money, reduces fuel emissions, and helps those carriers generate taxable income.

**BHGS Is Threatening Imminent and Unlawful Enforcement of its Permit Requirements**

36. Now, after more than two decades of serving California customers with their interstate moves without being subject to BHGS's permit requirements, U-Pack faces a dire and immediate threat from the State of California of being unlawfully forced to obtain a BHGS permit.

37. On January 26, 2021, BHGS wrote U-Pack a letter, a true and correct copy of which is attached hereto as Exhibit A. BHGS threatened that U-Pack must "cease operating [its] business in California [and] conducting moves into this state until the required valid [BHGS] permit has been obtained to operate/advertise as a household mover in this state." Ex. A at 1.

38. The letter threatened "enforcement" and extensive "civil and criminal penalties" against U-Pack if it continued to "operat[e] and advertis[e] as a household mover within the State of

---

[1] Herb Weisbaum, *New Report Warns of Bad Actors in the Interstate Moving Industry*, Consumers Checkbook (July 15, 2020), https://www.checkbook.org/national/consumers-notebook/articles/New-Report-Warns-of-Bad-Actors-in-the-Interstate-Moving-Industry-7398.

California without a valid operating permit," and warned U-Pack to "take notice that every violation of the provisions of the [California] Act is a separate and distinct offense, and in the case of a continuing violation, each day's continuance thereof is a separate and distinct offense." Ex. A at 3. A form enclosed with the letter separately warned that "[f]ailure to comply" with the letter "may result in further enforcement action[,] and continuing operations while unpermitted may subject the household mover to increasingly severe penalties." *Id.* at 2.

39. On February 5, U-Pack responded to BHGS's letter through a letter from counsel, a true and correct copy of which is attached hereto as Exhibit B. U-Pack explained *inter alia* that the FAAAA precludes BHGS from imposing its state-permit requirement on U-Pack's exclusively interstate transportation services, and that the BHGS permit requirement does not even apply to U-Pack because U-Pack does not facilitate any moves "entirely within this state [*i.e.*, California]," Cal. Bus. & Prof. Code § 19237(a)(1).

40. On February 12, the Legal Affairs Division of California's Department of Consumer Affairs ("DCA") replied to U-Pack in a letter, a true and correct copy of which is attached hereto as Exhibit C. DCA dismissed U-Pack's objections as "based on [a] misconception" that BHGS's permit requirement does not apply to an entity that "only conducts interstate moves," Ex. C at 1, and reiterated that U-Pack must "cease operations until it obtains the required permit," *id.* at 3. This time, the letter referenced additional penalty provisions for aiding and abetting violations of the California Act. *Id.* at 1–2.

41. On March 18, U-Pack responded to DCA's letter through a letter from counsel, a true and correct copy of which is attached hereto as Exhibit D. U-Pack again explained why any attempt to impose the BHGS permit requirement on U-Pack would be unlawful. *See* Ex. D. Nonetheless, BHGS has not withdrawn its demands for U-Pack to obtain a state permit or its threats to impose draconian penalties if U-Pack does not comply.

42. The FAAAA preempts, and the California Act does not permit, any attempt by BHGS to impose its permit requirements on U-Pack.

43. Section 14501(c)(1) of the FAAAA preempts BHGS's permit requirements as applied to U-Pack because U-Pack acts as a "broker . . . with respect to the transportation of property," and

the permit requirements would be "related to" U-Pack's prices, routes, and services. 49 U.S.C. § 14501(c)(1). A state regulation is "related to" a broker's prices, routes, or services if it has an "express reference" or "significant effect" on them. *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 388 (1992).[2]

    a.    U-Pack is a "broker" within the meaning of the statute because it exclusively arranges for a licensed motor carrier to transport the customer's property and does not transport the property itself. *See* 49 U.S.C. § 13102(2).

    b.    If applied to U-Pack, BHGS's permit requirements would have an express reference and significant effect on U-Pack's prices because BHGS's regulations of the "rates to be charged by household movers," Cal. Bus. & Prof. Code § 19253(a); *see* BHGS Regulations, Items 16, 80, 310,[3] would apply to U-Pack and would force it to change its rate structure in substantial ways.

    c.    If applied to U-Pack, BHGS's permit requirements would have an express reference and significant effect on U-Pack's routes by prohibiting U-Pack from using "any public highway in [California]" without a BHGS permit. Cal. Bus. & Prof. Code § 19237(a)(1).

    d.    If applied to U-Pack, BHGS's permit requirements would have an express reference and significant effect on U-Pack's services by dictating under what terms and conditions U-Pack can arrange for the transportation of customers' property within the State of California.

44.    BHGS's permits do not fall within the statutory exception to preemption for state regulation of the "*intra*state transportation of household goods," 49 U.S.C. § 14501(c)(2)(B) (emphasis added), because U-Pack is not a "household goods motor carrier" as defined in the statute,

---

[2] While *Morales* interpreted the Airline Deregulation Act, that Act contains an express preemption provision that the FAAAA explicitly borrowed. Accordingly, the two provisions are interpreted the same way. *See Rowe*, 552 U.S. at 368, 370.

[3] "BHGS Regulations" refer to Bureau of Household Goods and Services, *Maximum Rates and Rules for the Transportation of Used Property* (effective Jan. 1, 2021), https://bhgs.dca.ca.gov/forms_pubs/max_4_2021.pdf.

*see Ellenburg*, 473 F. Supp. 3d at 1103–04, and also because U-Pack does not engage in intrastate transportation.

      a.    U-Pack is not a "household goods motor carrier" because it drops off a cube container or trailer at the customer's home, and the container is "entirely loaded and unloaded" by the moving customer.  49 U.S.C. § 13102(12)(C); *see Ellenburg*, 473 F. Supp. 3d at 1097.

      b.    U-Pack does not engage in *intra*state transportation because it does not arrange for the transportation of any customer's property entirely within the State of California.

45.    The California Act separately does not authorize Defendants to apply BHGS's permit requirements to U-Pack because U-Pack does not arrange "[f]or transportation of household goods and personal effects *entirely within this state* [*i.e.*, California]," Cal. Bus. & Prof. Code § 19237(a)(1) (emphasis added).  For the same reason, U-Pack is not even a "household mover" subject to the BHGS permit requirement.  Although a "household mover" includes a "broker, as defined in [Section 19225.5(a)]," *id.* 19225.5(h), U-Pack is not a "broker" within the meaning of Section 19225.5(a) because its California-related services do not arrange for "the *intrastate* transportation of used household goods," *id.* § 19225.5(a) (emphasis added).

46.    Similarly, the California Act does not authorize BHGS to prohibit U-Pack from using public highways because Section 19235 of the California Act prohibits such use "except in accordance with the provisions of this chapter," Cal. Bus. & Prof. Code § 19235—and Section 19237 is the provision of "this chapter" specifying that U-Pack does not need to obtain a BHGS permit because it does not arrange for any moves entirely within California.

**Absent an Injunction, U-Pack and the Public Will Suffer Irreparable Harm**

47.    In the absence of a preliminary and permanent injunction, BHGS's efforts to compel U-Pack to obtain a BHGS permit threaten numerous irreparable harms to U-Pack and the public.

48.    BHGS's repeated enforcement threats impose on U-Pack "a kind of Hobson's choice," with "very real penalt[ies]" attaching "regardless of how [it] proceed[s]." *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1057–58 (9th Cir. 2009).  If U-Pack does not obtain a BHGS permit, it risks either being forced to shut down its California-related operations, or draconian fines

and penalties in an enforcement action. And if U-Pack were to obtain a BHGS permit, it would be forced to restructure its California-based business to comply with BHGS's onerous, costly, and inefficient regulatory regime.

49. If U-Pack continues its California-related services without obtaining a BHGS permit, U-Pack and its officers and employees will expose themselves to potentially huge liability under the California Act—as BHGS has made abundantly clear in its letters to U-Pack. *See* Ex. A; Ex. C. These penalties include:

    a. Fines of *at least* $1,000 and up to $10,000, imprisonment in the county jail for up to one year, or both, *per violation*, for operating as a household mover without a BHGS permit. Cal. Bus. & Prof. Code § 19277(a)–(b). Because each day's continuance of a violation is a separate and distinct offense, a single week of continued operation would risk up to $70,000 in fines and up to seven years in county jail. *See id.* §§ 19281, 19282.

    b. Fines of up to $1,000 and imprisonment in the county jail for up to three months, or both, for advertising as a household mover and aiding and abetting others, such as motor carriers that may similarly lack BHGS permits. Cal. Bus. & Prof. Code §§ 19278, 19279.1, 19279.2, 19279.3.

    c. Potential impoundment of U-Pack vehicles. *See* Cal. Bus. & Prof. Code § 19237(c).

    d. Private actions from customers seeking to recover all compensation paid to U-Pack for its services. Cal. Bus. & Prof. Code § 19237(b).

50. If U-Pack does not obtain a BHGS permit but tries to avoid the risk of enormous liability by instead ceasing its California-related services entirely, it faces irreparable harm in terms of lost business, lost profits, lost investments, harms to reputation, and lost customer goodwill.

    a. U-Pack risks losing a significant portion of its business and profits.

    b. U-Pack risks being forced to dispose of (or relocate at significant cost) substantial capital investments specific to its California-related services, including ReloCube trailers and forklifts.

  c. U-Pack risks losing significant investments it has made related to bookings and price quotes provided for upcoming moves to or from California. Numerous customers or potential customers would be left seeking alternative arrangements, many on very short notice.

  e. U-Pack risks losing significant customer goodwill and suffering severe damage to its "A+" reputation among customers. Shutting down its California operations and stranding numerous customers who have already booked moves into or out of California would create massive customer dissatisfaction and anger, irreparably damaging the strongly favorable reputation and goodwill that U-Pack has built up with its numerous satisfied customers nationwide over the years.

51. If U-Pack ceases its California-related services entirely, consumers face significant harm as well. In addition to the reduced competition and choice that all consumers will face in these circumstances:

  a. Customers forced by a shutdown of U-Pack to choose a full-service moving company will likely face much higher prices, poor customer service, and even the risk that some moving companies may take advantage of them by imposing high costs after providing a deceptively low initial quote.

  b. Customers forced by a shutdown of U-Pack to rent moving vehicles and perform their own moves from start to finish will face very real safety dangers—including heightened risks of traffic accidents on the highways of the State of California and other States and potentially injury or death—unless they have proper training to safely drive large trucks or haul trailers (which few customers do, unlike the experienced, often unionized, professional truck drivers who transport the shipments arranged by U-Pack).

  c. Customers forced by a shutdown of U-Pack to choose another competitor, such as PODS, with a business model similar to U-Pack's, will face higher prices for interstate transportation.

52. Alternatively, if U-Pack were forced to obtain a BHGS permit, it would be subject to the onerous requirements of the California Act and BHGS's implementing regulations. To comply

with this burdensome and extensive statutory and regulatory scheme, U-Pack would need to completely restructure its business model for its California-related services, at great expense.

53. Most saliently, if U-Pack were forced to obtain a BHGS permit, it would be forced to adopt an entirely new pricing scheme that would increase its prices and radically change the company's relationship with its California customers:

    a. U-Pack would need to change from a volume-based to a weight-based pricing model. The California Act expressly prohibits volume-based pricing models, Cal. Bus. & Prof. Code § 19253.1, and BHGS's mandated rate structure is based primarily on the weight of the goods being transported. This weight-based structure translates to higher prices and affords customers much less certainty, as the volume of the containers a customer selects can be known ahead of the move, but weight cannot be determined until the goods are transported and the truck driver has had a chance to weigh the truck on a scale.

    b. U-Pack also would need to change from an individualized pricing model to a one-size-fits-all model. U-Pack's current pricing model promotes flexibility, as it uses sophisticated algorithms to provide customers with targeted discounts. But the California Act imposes a fixed-rate structure that would give U-Pack substantially less flexibility in pricing and less ability to save customers money. *See* Cal. Bus. & Prof. Code §§ 19254–19256.

    c. U-Pack would need to increase its prices to account for increases in insurance coverage mandated by the California Act and BHGS's regulations. *See* Cal. Bus. & Prof. Code § 19248(c); BHGS Regulations, Item 470.

54. This wholesale restructuring of U-Pack's business model, if possible at all, would come at substantial cost to U-Pack and its customers.

    a. BHGS's mandated weight-based pricing model is an old-fashioned and outdated model that diminishes operational efficiency by requiring trucks to go out of route and weigh their cargo (often after waiting in long lines to do so). Changing to a weight-based model would reduce the number of shipments that U-Pack can arrange per year, translating to fewer customers and lower revenues.

  b. U-Pack also would need to incur substantial administrative costs developing a compliance regime for, *e.g.*, fielding inquiries from BHGS regulators, preserving records, and making U-Pack's books, equipment, and other assets available for inspection. *See* Cal. Bus. & Prof. Code §§ 19258–19262.

  c. Motor carriers would be unlikely to contract with U-Pack for fear of being deemed "subhaulers" that are also subject to BHGS's permit requirement and extensive regulatory regime. Cal. Bus. & Prof. Code § 19266(a). This risk of burdensome regulation for potential motor carriers would harm U-Pack's ability to compete with companies like U-Haul, which rely on customers to perform their own moves, and with full-service moving companies, which do the transportation themselves. Similarly, if U-Pack were forced to obtain a BHGS permit, it would lose its ability to compete effectively with unregulated competitors who would continue to be able to charge lower rates.

  d. It would take at least a year for U-Pack to restructure its business in a way that would comport with California's statutory and regulatory regime—assuming it is even possible to do so. In the meantime, U-Pack would lose a year's worth of California-related revenue and incremental profit.

  e. Customer confidence and trust in U-Pack's services and rates would plummet, as the switch to BHGS's mandated weight-based pricing model would force U-Pack to offer significantly less certainty in price, and much higher prices. That would lead to, in turn, reduced volume of business, reduced need for employees (including unionized truck drivers), and lower customer satisfaction.

## FIRST CLAIM FOR RELIEF

**Supremacy Clause, U.S. Const. art. VI, § 2, FAAAA Preemption, § 49 U.S.C. 14501(b), (c)**

55. Paragraphs 1–54 are incorporated by reference as if alleged herein.

56. Under the Supremacy Clause, federal law is "the supreme Law of the land." U.S. Const. art. VI, § 2.

57.     The FAAAA expressly prohibits the State of California from making, applying, or enforcing any "law related to a price, route, or service of" any "broker . . . with respect to the transportation of property."  49 U.S.C. § 14501(c)(1).

58.     U-Pack is a "broker" within the meaning of the FAAAA because it exclusively arranges for a third-party motor carrier to transport the customer's property and does not transport the property itself.  *See* 49 U.S.C. § 13102(2).

59.     The California Act's requirements are related to U-Pack's prices, routes, or services because they reference and impose significant burdens on U-Pack's prices, routes, and services.

60.     No statutory exception to preemption is applicable.  The statutory exception for state regulation of "intrastate transportation of household goods," 49 U.S.C. § 14501(c)(2)(B), does not apply to U-Pack because U-Pack is not a "household goods motor carrier" within the meaning of the statute, *see Ellenburg*, 473 F. Supp. 3d at 1097, and U-Pack does not arrange for any intrastate moves entirely within California.

61.     Even if U-Pack's California-related services were somehow deemed *intra*state, BHGS's permit requirements still would be preempted because the FAAAA expressly preempts any state "law relating to [the] intrastate rates, intrastate routes, or intrastate services of any freight forwarder or broker."  49 U.S.C. § 14501(b)(1).

62.     At all relevant times, U-Pack had, has, and will have the right under the Supremacy Clause not to be subjected to regulation or punished under state laws that are expressly preempted by federal law.

63.     An actual controversy exists among the parties because, if BHGS's permit requirements can lawfully be applied to U-Pack, U-Pack cannot operate its California-related services unless it obtains a permit.

64.     If U-Pack continues its California-related services without obtaining a BHGS permit, U-Pack and its officers and employees face enormous liability under the California Act—including substantial civil penalties and imprisonment for *each day* U-Pack does not obtain a permit, *see* Cal. Bus. & Prof. Code § 19277(a)–(b), 19281, 19282, substantial civil penalties and imprisonment for aiding and abetting motor carriers that do not have a BHGS permit, *see id.* §§ 19278, 19279.1,

19279.2, 19279.3, potential impoundment of U-Pack vehicles, *see id.* § 19237(c), and private actions from customers seeking to recover all compensation paid to U-Pack for its services, *see id.* § 19237(b).

65. If U-Pack does not obtain a BHGS permit and is forced to cease its California-related services entirely, it faces irreparable harm in terms of significant loss of business and profits, lost investments, diminished reputation, and loss of customer goodwill.

66. Alternatively, if U-Pack were forced to obtain a BHGS permit, it would be subject to the onerous requirements of the California Act and BHGS's implementing regulations. To comply with this burdensome and extensive statutory and regulatory scheme, U-Pack would need to adopt an entirely new pricing scheme that would diminish operational efficiency, incur significant compliance costs, risk diminished ability to contract with motor carriers and diminished competitive standing, and force U-Pack to increase its prices and radically change its relationship with its California customers—which could cause a significant loss of business and customer goodwill.

67. Unless Defendants are restrained and enjoined from enforcing against U-Pack BHGS's permit requirement under California Business & Professions Code §§ 19235 and 19237, U-Pack will suffer the above irreparable harms. In addition, consumers will be harmed by the loss of market options and higher prices if U-Pack ceases its California-related services.

68. The State of California's repeated threats to enforce California Business & Professions Code §§ 19235 and 19237 against U-Pack constitute an imminent irreparable harm that makes injunctive relief appropriate.

69. Because U-Pack has no plain, speedy, and adequate remedy at law, injunctive relief is necessary.

## SECOND CLAIM FOR RELIEF

### Household Movers Act, Cal. Bus. & Prof. Code § 19225 *et seq.*

70. Paragraphs 1–69 are incorporated by reference as if alleged herein.

71. The California Act does not authorize Defendants to enforce BHGS's permit requirements against U-Pack. U-Pack does not arrange "[f]or transportation of household goods and

personal effects entirely within [the State of California]," Cal. Bus. & Prof. Code § 19237(a)(1), but instead arranges exclusively for moves between California and another State.

72. In addition, and for the same reason, U-Pack is not a "household mover" or "broker" within the meaning of this provision because it does not arrange for "the intrastate transportation of used household goods." Cal. Bus. & Prof. Code § 19225.5(a).

73. Similarly, the California Act does not authorize BHGS to prohibit U-Pack from using public highways because Section 19235 of the California Act prohibits such use "except in accordance with the provisions of this chapter," Cal. Bus. & Prof. Code § 19235—and Section 19237 is the provision of "this chapter" that specifies the circumstances in which a household mover is required to obtain a BHGS permit.

74. Absent preliminary and permanent injunctive relief, U-Pack will suffer the irreparable harms of facing draconian civil and criminal penalties (or a significant loss of business), or alternatively being required to restructure its business at significant cost to U-Pack and its customers.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests that the Court:

1. Declare that, as applied to U-Pack, the requirements of the California Household Movers Act, California Business & Professions Code § 19225 *et seq.*, are expressly preempted by federal law;

2. Declare that California Business & Professions Code §§ 19235 and 19237 do not require U-Pack to obtain a BHGS permit to perform its California-related services;

3. Preliminarily and permanently enjoin Defendants, and any division, board, or commission within or subject to supervision or control by such Defendants, from enforcing against U-Pack the permitting or other requirements set forth in the California Household Movers Act, California Business & Professions Code § 19225 *et seq.*;

4. Enter judgment for Plaintiff; and

5. Grant Plaintiff such other relief as this Court deems just and proper.

Dated: April 7, 2021

Respectfully submitted,

By: /s/ Thomas G. Hungar
Thomas G. Hungar, SBN 144956
Kellam M. Conover (*pro hac vice to be filed*)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC  20036-5306
thungar@gibsondunn.com
Phone: (202) 887-3784
Fax: (202) 530-4213

Attorneys for ArcBest II, Inc. d/b/a U-Pack